TIPTON et al. v. RAILWAY POSTAL CLERKS' INV. ASS'N et al.
(No. 8149.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 12, 1914. Rehearing Denied Feb. 20, 1915.)

1. APPEAL AND ERROR ☞101—DECISIONS APPEALABLE—ORDER DENYING RECEIVERSHIP.

While Vernon's Sayles' Ann. Civ. St. 1914, art. 2079, expressly authorizes appeals from interlocutory orders appointing a receiver, no appeal is authorized by statute from an interlocutory order denying the appointment of a receiver, and, it being strictly a statutory remedy, no appeal lies.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 681–687; Dec. Dig. ☞101.]

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**2. INJUNCTION ⬚172—TEMPORARY INJUNCTION—DISSOLUTION.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 4671, providing that the principles, practice, and procedure governing courts of equity shall govern injunction proceedings when not in conflict with the provisions of that title or other law, the matter of dissolving a temporary injunction previously granted may be heard and determined on the bill and answer with such affidavits as are attached thereto, and made a part thereof, without the introduction of parol testimony, it being largely within the discretion of the trial court whether parol testimony shall be received; but, where such matter is heard on the pleadings alone, the answer to justify the dissolution of the injunction should negative in unmistakable terms all of the material allegations set forth in the petition as grounds for the relief prayed for.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 374–384; Dec. Dig. ⬚172.]

**3. CORPORATIONS ⬚211—ACTIONS BY MINORITY STOCKHOLDERS — SUFFICIENCY OF PETITION.**

A petition alleged that plaintiffs were stockholders in a Georgia investment corporation, which for years did a prosperous business which extended over the United States and particularly in Texas; that to handle its Texas business, and avoid the payment of taxes and the restrictions and obligations upon foreign corporations, it organized a subsidiary Texas corporation, all of the capital of which was furnished by the Georgia corporation; that the president of the Georgia corporation became the president of the Texas corporation, and the two other officers and stockholders of the Texas corporation were directors in the Georgia corporation; that the Texas corporation held no directors' or stockholders' meetings and was dominated by the Georgia corporation, which furnished all the money with which it operated its loan business, and to which all moneys collected were forwarded; that R., one of the officers of the Texas corporation, was its manager and was working for the Georgia corporation on a salary; that the president of the Georgia corporation organized another company; and the Georgia corporation acting through its officers purchased from such company a large amount of worthless bonds; that it sold a large part of its assets and capital to its vice president, thereby parting with such an amount of capital and assets and so restricting its business as practically to dissolve; that, without plaintiffs' consent, it attempted to consolidate with an insolvent trust company; that it sold a large amount of its capital and assets, including notes evidencing loans to residents of Texas, to the Texas corporation, taking R.'s personal note therefor; that such assets were the only remaining assets of the Georgia corporation; that the Texas corporation and its president were collecting the notes and converting the proceeds to their own use and placing or attempting to place them outside the state. It made the two corporations, a trust company, the president of the corporations, R., and certain others, defendants, and prayed for a foreclosure of plaintiffs' equitable lien as creditors of the Georgia corporation on the assets and property within the state. *Held*, that the petition stated a cause of action, particularly against R. and the Texas corporation, as the minority shareholders of a corporation have an equitable lien upon its property which the majority has sold to themselves in breach of their fiduciary relations, and the courts of this state had jurisdiction over the assets within the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 814–818, 820, 821, 823, 824; Dec. Dig. ⬚211.]

**4. CORPORATIONS ⬚671 — ACTIONS BY MINORITY STOCKHOLDERS—TEMPORARY INJUNCTION.**

Where many of the material allegations of such petition were not specifically denied by the answer, the court erred in dissolving a temporary injunction restraining defendants from disposing of or removing any of the assets within the state, or which might come into the state, from the state, or beyond the jurisdiction of the court.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2643, 2644; Dec. Dig. ⬚671.]

Appeal from District Court, Tarrant County; Marvin H. Brown, Judge.

Action by Eugene Tipton and others against the Railway Postal Clerks' Investment Association and others. From an order and judgment refusing a receivership, dissolving a temporary injunction, and denying a permanent injunction, plaintiffs appeal. Reversed and remanded.

See, also, 170 S. W. 113.

Geo. W. Dunaway and Stanley Boykin, both of Ft. Worth, for appellants. John C. Miller, Capps, Cantey, Hanger & Short, and D. B. Trammell, all of Ft. Worth, for appellees.

BUCK, J. Appellants Eugene Tipton and eight others filed this suit in the district court of Tarrant county against the Railway Postal Clerks' Investment Association and the Trust Company of the South, both alleged to be domiciled in Georgia, hereafter for brevity styled the "Georgia corporation" and the "trust company," and against the Railway Postal Clerks' Investment Association of Texas, hereafter called the "Texas corporation," and the individuals William Seltzer, J. S. Wallace, John Miller, and E. D. Rutledge. Plaintiffs in their petition alleged: That they were, and had been for many years, postal clerks in the employ of the United States. That about the year 1905 they become stockholders in the Georgia corporation and had subscribed for and had issued to them shares of stock at the par value of $100, aggregating 66 shares. That said Georgia corporation was originally organized by and controlled by postal clerks and had for its main purpose the lending of money at reasonable rates to postal clerks without collateral security, and with a quasi insurance feature attached to said loans, in that the notes evidencing the loans provided that they should become void, both as to the principal and to the sureties, if the maker should die before their maturity. That the corporation was capitalized for $225,000, and for many years did a safe and prosperous business and paid regular dividends upon its stock. That while the business of the corporation was conducted at Atlanta, Ga., its business began to grow and extend over the United States and particularly in Texas. That, in order to handle the Texas business properly and to facilitate and increase the same, it became essential to have some character of local

agent or officer in Texas, and preferably in Ft. Worth, on account of that city being division headquarters of the railway mail service, and, consequently, the place of residence of many postal clerks. To accomplish this purpose and to avoid the payment of taxes and the restrictions and obligations placed by the laws of Texas upon foreign corporations operating within her borders, the Georgia corporation, without the knowledge or consent of appellants, organized, in 1911, a "dummy" or subsidiary corporation known as the "Railway Postal Clerks' Investment Association of Texas," incorporated under the laws of Texas with a $10,000 capital. That the $10,000 paid in when said Texas corporation was organized was furnished by the Georgia corporation. That William Seltzer, president of the .Georgia corporation, also became president of the Texas corporation, and that the two remaining officers and stockholders of the Texas corporation, to wit, Rutledge and Miller, were each directors in the Georgia corporation and continued so to be. That no semblance of corporate existence, save the name, was maintained by the Texas corporation. That it held no meetings of its directors or stockholders. That it was solely controlled and dominated by the Georgia corporation. That the Georgia corporation furnished all of the money with which it operated its loan business. That all the moneys collected by the Texas corporation were regularly forwarded to the Georgia. corporation semimonthly, together with full reports of its business, receipts, expenditures, etc. That said Rutledge was the manager of said Texas corporation, appointed by the board of directors of the Georgia corporation, and working for said latter corporation at a salary of $200 per month. That the policy of making or curtailing loans, and all the policies for said Texas corporation, were dictated by said Georgia corporation. In short, that the Texas corporation was a corporation in name only, and was in reality the Georgia corporation operating in Texas through a local agency without a permit to do business in this state. It was further alleged that the defendant Seltzer, while president of the Georgia corporation, caused to be organized in Georgia another corporation known as the American Bakers' Corporation of ·Atlanta, Ga.; that said Bakers' Corporation issued a large amount of watered and worthless bonds; and that said Georgia corporation, without the consent of any of its stockholders, but acting through said Seltzer, its president, and said Rutledge and Miller, in conjunction with its other officers, bought $200,000 worth of said bonds at the par value, paying cash therefor out of the treasury of the Georgia corporation, thereby draining the treasury of the Georgia corporation of its working capital; that shortly thereafter said Georgia corporation and said Texas corporation stopped making loans; that shortly after this transaction the Georgia corporation, acting through its president and board of directors, and without plaintiffs' knowledge or consent, sold a large part of its assets and capital, to wit, about $46,000 worth of promissory notes evidencing its loans as aforesaid to the vice president of said Georgia corporation, W. R. Ryan, and at the same time, without the knowledge or consent of plaintiffs, the said Georgia corporation entered into an agreement with said Ryan that said corporation would cease to transact any of its loan business east of the Mississippi river in order that said Ryan might operate said business in this territory himself, said last-named acts occurring some time in the fall of 1912, but alleged not to have been discovered by plaintiffs until February, 1913. It is further alleged that, by reason of the aforesaid acts of said Georgia corporation, it had parted with such a considerable amount of its capital and assets and had so restricted its business territory as·to amount to a practical dissolution of said corporation and to a breach of appellants' contract with said corporation as subscribers thereto, and was in fact and effect a conversion of plaintiffs' interests in said corporation, which rendered said corporation liable to plaintiffs for the value of their stock at said time.

They further allege that on or about February 8, 1913, without the consent of plaintiffs, the Georgia corporation consolidated or attempted to consolidate with the defendant trust company, which was alleged to be a worthless and insolvent company; that by such consolidation the original aims and purposes of the Georgia corporation were fundamentally changed, in that, under such agreement of consolidation no further loans were to be made to postal clerks without collateral security, the insurance feature was to be eliminated from the obligations, and the consolidated company was not to be controlled by postal clerks; and that such consolidation or attempted consolidation was a further act that aided in causing a practical dissolution of said Georgia corporation. It is further alleged: That after the meeting of the stockholders of the Georgia corporation on February 8, 1913, the said Georgia corporation sold to the defendant the Texas corporation its own stock, and that in payment thereof about $42,000 worth of the capital and assets of said Georgia corporation, consisting of notes as afore described, most of same being upon loans that had been made by said purported Texas corporation, but which were held as part of the assets and capital of the Georgia corporation. That in payment for said assets the said Rutledge gave his personal note for the face value of said notes, and that said Texas corporation and said Rutledge took possession and control of said assets. That all of said notes were payable at Ft. Worth, Tex., and nearly all of the makers lived in Tarrant county

Tex.    Plaintiffs further pleaded that the parting with said assets was an additional act causing the practical dissolution of said corporation, and that said corporation was in a state of practical dissolution and had ceased to do business, and that there was no prospect of its ever again engaging in business, and that under such conditions the said notes or choses in action constituted a trust fund for the satisfaction of creditors and stockholders of said corporation, and that the Texas corporation and said Rutledge came into possession of said trust property with full knowledge of its trust character and became liable to creditors and stockholders of said corporation for the misappropriation or wrongful use of such property.    Plaintiffs further alleged that defendants Rutledge and Miller were directors in said Georgia corporation and were the only directors of said corporation residing in Texas, and that as such directors of such sold-out or dissolved corporation they were trustees for the benefit of creditors and stockholders of said corporation to the extent of its property remaining.    They further alleged that the plaintiffs were the only complaining stockholders, and, as far as they knew, the only creditors of said Georgia corporation; but that, if they were mistaken in such allegation, then they sued for all persons similarly situated and having similar rights; that the said assets sold to the said Texas corporation and said Rutledge were the only assets remaining of said Georgia corporation; that none of said defendants had property subject to execution sufficient to satisfy appellants' demands outside of said assets; that said Rutledge was avoiding his said trust; and that he and said Texas corporation and said Seltzer were collecting said notes and diverting and converting the proceeds of same to their own use, and had already placed, or attempted to place, a large part of said assets outside of the state and beyond the jurisdiction of the trial court, and, unless restrained from further so doing, would collect and convert to their own use and benefit all of said trust funds, which would defeat plaintiffs' claim. They further alleged that by reason of said notes being payable at Ft. Worth, Tex., and many of the makers of same being residents of Tarrant county, Tex., the situs of the property was in Tarrant county, Tex., and that the district court of said county had jurisdiction to appoint a receiver to take charge of and collect said notes and property, and make appropriate allegations of fact showing why a receiver should be appointed for said Texas corporation; among other things, that said corporation was in imminent danger of insolvency.

They prayed for judgment against defendants and each of them, for their said debt and damages, that they have foreclosure of the equitable lien upon said assets and property, and that a receiver be appointed to take charge of said assets under the direction of the court, and that they have a temporary injunction restraining defendants from removing out of Texas and out of the jurisdiction of the court any of the funds and assets now in Texas and belonging to the defendants.    As a basis for this prayer, they alleged that the court had jurisdiction to render the judgment prayed for upon the following grounds:  (1) The organization and operation of the Texas corporation was a fraud upon the laws of Texas and a mere device of the Georgia corporation to evade the provisions of our laws relating to the operation of foreign corporations in Texas, and that the Texas corporation was really the Georgia corporation; or, in the alternative (2), that if the court should hold that the Texas corporation was a valid and distinct corporate entity it was merely the creature or agent of the Georgia corporation, and that service of process upon the Texas corporation would bring the Georgia corporation into court; or, in the alternative (3), that the notes or choses in action sold to the Texas corporation and Rutledge were the property of the Georgia corporation and were trust funds upon which plaintiffs had an equitable lien for the satisfaction of their claim, and the situs of these funds was within the jurisdiction of the court, and that the court had jurisdiction to impound such funds and use the same to satisfy plaintiffs' demands; and (4), that the Texas corporation and said Rutledge were originally liable to appellants by reason of the fact that they had come into possession of the trust funds in which appellants had an equitable interest with full knowledge of the character of such funds, and had misappropriated the same and converted the proceeds to their own use and benefit.

Plaintiffs' petition was duly verified under oath, and when presented to the court on July 30, 1914, the court granted the temporary injunction as prayed for "restraining the defendants from disposing of or removing any of the assets that may be situated in the state of Texas, or which may hereafter come into said state, from said state or beyond the jurisdiction of this court," and the case was set down for future date for hearing on the application of the appointment of a receiver.

During the following term of the court, to wit, September 17th, the defendants E. D. Rutledge and Texas corporation filed their answer, in detail, admitting, denying or otherwise referring to the allegations contained in the some 55 paragraphs of plaintiffs' first amended original petition; said answer containing a general demurrer to said petition.

Upon a hearing, the trial court refused the prayer for receivership, dissolved and vacated the temporary writ of injunction there-

tofore granted, and denied the permanent injunction prayed for, and from this order and judgment the plaintiffs appealed.

[1] Appellees suggest in their brief that this court has no jurisdiction over the order of the trial court in refusing. to appoint a receiver for the reason that the statute authorizes no appeal from such order. Article 2079, Vernon's Sayles' Tex. Civ. Stat., authorizes an appeal from an interlocutory order of the district court appointing a receiver or trustee in any case, under certain conditions to be complied with, but no appeal is authorized by statute from an interlocutory order denying the appointment of a receiver, and, this being strictly a statutory remedy, we think appellees' point well taken. Article 2079, Vernon's Sayles' Tex. Civ. Stat.; Cone v. Hudson, 139 S. W. 1167; T. & O. Lumber Co. v. Applegate, 53 Tex. Civ. App. 66, 114 S. W. 1159; Moore v. Cobe, 156 S. W. 1142. And since the right of appellants to the permanent injunction prayed for can only be determined upon a hearing of the case upon its merits, we will consider in this opinion only the question as to whether or not the trial court erred in vacating and dissolving the temporary injunction theretofore granted by him, and to that phase of the case we will now direct our attention.

Article 2080, Vernon's Sayles Tex. Civ. Stat., provides:

Appeals shall also lie from the district and county courts to Courts of Civil Appeals, from orders granting or dissolving temporary injunctions in cases and manner provided for in articles 4644, 4645."

Article 4644, Revised Statutes 1911, in part is as follows:

"Any party or parties to any civil suit wherein a temporary injunction may be granted, refused or dissolved under any of the provisions of this title, in term time or in vacation, may appeal from the order or judgment granting, refusing 'or dissolving such injunction, to the Court of Civil Appeals having jurisdiction of the case; but such appeal shall not have the effect to suspend the enforcement of the order appealed from, unless it shall be so ordered by the court or judge who enters the same."

And article 4645 is in part as follows:

"It shall not be necessary to brief such case in the Court of Civil Appeals or Supreme Court, and the case may be heard in the said courts on the bill and answer, and such affidavits and evidence as may have been admitted by the judge granting, refusing or dissolving such injunction."

[2-4] Since article 4671, Vernon's Sayles' Tex. Civ. Stat., provides that the "principles, practice and procedure governing courts of equity shall govern proceedings in injunctions when the same are not in conflict with the provisions of this title or other law," the trial court was authorized to hear and determine the matter of the dissolution vel non of the temporary writ of injunction previously granted on the bill and answer; that is, upon the verified pleadings of plaintiffs and defendants, together with such affidavits as might be attached thereto and made a part thereof, without the introduction of any parol testimony. As to whether or not such parol testimony was requisite was a matter largely within the discretion of the trial court. But where such a cause is heard on the verified pleadings alone, the answer of the defendants should negative in unmistakable terms the material allegations and all of the material allegations set forth in plaintiffs' petition, as grounds alleged for the granting of the relief prayed for. If plaintiffs' petition alleged a cause of action against defendants and especially against the defendants Rutledge and the Texas corporation, it occurs to us that it certainly set forth a condition of affairs which justified and called for the protecting and staying hand of the law, in the form of a writ of injunction, to prevent the further acts of the defendants, of the nature and character complained of, and especially to restrain Rutledge and Seltzer and associates from continuing to do those things and pursue that course of action which had, as alleged by plaintiffs, theretofore resulted in the wrecking and practical dissolution of the Georgia corporation, and, in a large measure, depriving plaintiffs of their property. The trial court, in effect, held that plaintiffs had stated a cause of action against these defendants, Rutledge and the Texas corporation, particularly, by his action in overruling the general demurrer leveled by defendants at said petition, and in this ruling we do not believe the trial court erred.

While the question is not devoid of difficulty, yet we are of the opinion, from an examination of the authorities cited by both appellants and appellees, that plaintiffs in the court below, in their trial petition, stated a cause of action against both the Texas and the Georgia corporations and against Seltzer and his associates. That the minority stockholders of a corporation have an equitable lien upon its property which the majority have sold to themselves, in violation of their fiduciary relations, is stated by Mr. Jones, in his valuable work on Liens 'volume 1, par. 87, p. 59), in the following language:

"The minority shareholders of a corporation have an equitable lien upon its property which the majority has sold to themselves, in breach of their fiduciary relations. * * * An equitable lien may be decreed to exist in favor of such minority shareholders upon the property of the old corporation in the hands of the new corporation to the extent of the value of the property which they have been deprived of. Such lien is prior to the lien of the stockholders of the new corporation, but is subject to the lien of the holders of its 'mortgage bonds.'"

In support of the doctrine thus stated, we find many cases both in this state and in other jurisdictions. I. & G. N. v. Bremond, 53 Tex. 96; Clark v. Brown, 108 S. W. 421; Tanner v. Lindell, 180 Mo. 1, 79 S. W. 157, 103 Am. St. Rep. 534; Ervin v. Ry., 27 Fed. 625.

In the case last cited the court says:

"It cannot be denied that minority stockholders are bound hand and foot to the majority in all matters of legitimate administration of the corporate affairs, and the courts are powerless to redress many forms of oppression practiced upon the minority under the guise of legal sanction, which fall short of actual fraud. This is a consequence of the implied contract of association, by which it is agreed, in advance, that a majority shall bind the whole body as to all transactions within the scope of the corporate powers. But it is also of the essence of the contract that the corporate powers shall only be exercised to accomplish the objects for which they were called into existence, and that the majority shall not control those powers to pervert or destroy the original purposes of the corporators. * * * It is for this reason that the majority cannot consolidate the corporation with another corporation, and impose responsibilities and hazards upon the minority not contemplated by the original enterprise."

That the petition alleged a state of facts conferring jurisdiction upon the court through whose aid the appellants sought to have their rights enforced and protected we believe also to be well established by the authorities.

The case of Bragg v. Gaynor, 85 Wis. 468, 55 N. W. 919, 21 L. R. A. 161, was a case in which a resident of Wisconsin sought judgment against a nonresident defendant, an injunction against certain persons, also residents of Wisconsin, who were debtors of said nonresident defendant, and also sought the appointment of a receiver to collect the debts due to said nonresident and apply the same to the plaintiff's claims. The court says:

"The courts of this state can exercise jurisdiction only over persons and property within its territory; but it is familiar law that through its tribunals it may subject property within its limits, owned by nonresidents, to the payment of the demands of its own citizens against them; and the exercise of this jurisdiction in no respect infringes upon the sovereignty of the state where such owners are domiciled."

Quoting from Pennoyer v. Neff, 95 U. S. 726, 24 L. Ed. 565, the court goes on:

" 'Every state * * * owes protection to its own citizens, and when nonresidents deal with them it is a just and legitimate exercise of authority to hold and appropriate any property owned by such nonresident to satisfy the claims of its citizens.' This jurisdiction is called into exercise and attaches where property is once brought under the control of the court by seizure or acts of equivalent import, and which stand for and represent the dominion of the court over the thing, and, in effect, subject it to the control of the court. This may be by the levy of a writ, or by the *mere bringing of a suit.* (Italics ours.) 'It is immaterial,' said Mr. Justice McLean, in Boswell v. Otis, 50 U. S. (9 How.) 336 [13 L. Ed. 164], 'whether the proceeding against the property be by an attachment or *bill in chancery.* * * * As bills of exchange and promissory notes do not alter the nature of simple contract debts, but are merely evidences of [the debt or] title, the debts due on these instruments are *assets where the debtors live,* and not where the instrument was found.' (Emphasis ours.) By the injunction granted in this case [Wisconsin] against the defendants resident in this state, the court in the most effective manner possible asserted its dominion and control over the indebtedness sought to be reached, and there can be no doubt, we think, that these debts were thus brought, by reason of this equitable levy, within the control and dominion of the court for the purposes of this action, which was made effective by its final judgment *appointing a receiver to collect them [these assets] and apply the proceeds to the plaintiff's judgment.* * * * We are not aware of any well-considered case in conflict with this view." (Emphasis ours.)

In the case of Crumlish v. Railway Co., 28 W. Va. 623, the following language occurs:

"After a corporation has been dissolved or its charter declared forfeited,, the stockholders occupy towards it the position of deferred creditors, and they may in such case sue [the corporation] as any other creditor to have its assets administered. When a suit is brought by a stockholder of a foreign corporation on behalf of himself and the other stockholders against a *domestic corporation having property in this state belonging to said foreign corporation or owing debts to it,* and the bill shows that the foreign corporation had ceased to use its franchises, and been dissolved by virtue of the laws of the state of its creation, and had no property or assets except those in the hands of the said domestic corporation and within the jurisdiction of the court, held, the courts of this state have jurisdiction of such suit, notwithstanding the fact that said foreign corporation cannot be brought within the jurisdiction of such courts. *The said foreign corporation is not an indispensable party to such suit.*" (Italics ours.)

In Redmond v. Hoge, 3 Hun, 171, the court uses the following language:

"The case is an extraordinary one, and certainly calls for the application of some remedy, if it be in the power of the court sitting in equity to grant any. * * * It is objected that the Enfield Company is a foreign corporation, and that this court has acquired no jurisdiction." It is further "insisted that the object of the action is to wind up the affairs of a foreign corporation, and distribute its property among the parties entitled to it. We do not understand the object of the action to be the dissolution and winding up of the * * * Enfield Company. The corporation seems already to have been practically dissolved, * * * but we must assume it to have legal vitality, because its debts are not fully extinguished, and its assets wholly distributed. The object, however, of this action, is to reach and preserve a portion of its assets (the foreign corporation), which are beyond the jurisdiction of the Connecticut courts, and within our own [jurisdiction], and are the hands of officers of the corporation *who cannot be sued in Connecticut,* and who have the power to prevent suit by the corporation itself in our courts, and which funds are shown * * * to be in a precarious condition. The complaint does not ask that the corporation be dissolved by our courts, nor that its affairs be wound up, nor that its general property be distributed. *Its sole aim is at the particular fund now in danger,* the preservation of which is the chief object, and its payment and distribution * * * are secondary and incidental objects of the action. The papers show * * * that the corporation is in process of winding up its own affairs" in the courts of Connecticut, "and that the courts of that state have been invoked and have accordingly made orders in aid of that process, and this suit, in one point of view, may be said to be ancillary to that proceeding. Yet it neither controls nor terminates it. Judgment complete and final in this case will not terminate the corporate existence of the Enfield Company. * * * We have jurisdiction of the property, because it is within our territory. The plaintiffs are also citizens of our state, and show themselves to be remediless both in Connecticut and in the federal courts. We are not prepared to say, until some higher tribunal shall admonish us to the

contrary, that this court has not, under such circumstances, power to intervene, so far as relates to the property actually within this state. The court is not powerless, in such case, to enforce any judgment it may render, *so long as it is limited to the particular fund which it finds * * * and takes from the hands of persons over whom its jurisdiction is complete and puts it into the safe-keeping of" the officers of the court; and "we are aware of no authority which denies to us jurisdiction in a case containing all the elements of the one before us."* (Italics ours.)

Therefore we conclude that the trial court had jurisdiction over the notes and choses in action, the removal of which from the state and jurisdiction of the court the appellants sought to enjoin.

Plaintiffs' petition alleged a state of facts, if true, which in our opinion disclosed a course of juggling manipulation and high-handed dealing with the affairs and the assets of the Georgia corporation not very often revealed in a court of equity. As to the truth or falsity of these allegations, we are not able to determine; but, unless such allegations have been by the defendants' answer specifically and positively denied under oath in every material aspect, we are of the opinion that the trial court was not justified in dissolving the temporary writ of injunction. In order to determine whether or not the defendants in the court below met the full measure of responsibility and burden placed upon them by plaintiffs' verified pleadings, let us consider some of the allegations contained in said petition and the answers thereto.

For instance, in paragraph 7 of plaintiffs' trial petition, it was alleged, in substance, that the Georgia corporation, in order to facilitate the carrying on of its Texas business and to increase the same, decided to carry on said Texas business through some agency located in Texas that could deal direct with Texas borrowers, and, in order to avoid the franchise taxes and burdens cast by the laws of Texas upon a foreign corporation doing business in Texas under a permit from the state, said Georgia corporation and Seltzer, and his associates, conceived the plan of organizing, and did organize, the Texas corporation, and that said Texas corporation bore the same name as the Georgia corporation, with the exception of the words "of Texas" added to the name of the Georgia corporation. In their answer to the allegations contained in said paragraph of plaintiffs' petition, the defendants simply "deny any conspiracy on the part of Seltzer or his associates to get possession of a large part, or any part, of the assets in said Georgia corporation, as set out in paragraph B thereof, and deny that said Seltzer and his associates, or any of them, at any time conspired together in any manner to get possession of any of the assets of said association." It will be seen that there is no denial of the allegation that the Texas corporation was organized by Seltzer and his

associates for the purpose of carrying on in Texas the business of the Georgia corporation, thereby avoiding the franchise taxes and burdens cast by the law of Texas upon a foreign corporation, and therefore we must conclude that this part of the plaintiffs' allegation in said paragraph is admitted to be true.

In paragraph 9 of plaintiffs' petition, they alleged, in substance, that the application for the charter of the Texas corporation stated that said Seltzer had paid in in cash the sum of $9,800 and the said Rutledge and Miller each the sum of $100 in cash; that in reality and in truth the said Seltzer never subscribed any money for incorporating said company, but said money was furnished by said Georgia corporation to said Seltzer as trustee, and that the money paid in by Rutledge and Miller was also furnished by said corporation; that, immediately upon the organization of said Texas corporation and the granting of its charter, all of the stock in the same, consisting of 100 shares of the par value of $100 each, pretended to be held by said Seltzer, Rutledge, and Miller, were delivered to the said Georgia corporation in its office at Atlanta, Ga., which continued to own, hold, and possess the same until the events occurred as thereafter set out in the petition; that all of said money that said Texas corporation loaned and operated on was furnished from time to time by said Georgia corporation, about $10,000 per month; that E. D. Rutledge was appointed by the board of directors of the Georgia corporation the manager of said Texas corporation, the said Rutledge being nominally its secretary, and receiving for his services a salary of $200 per month, voted and allowed to him by the board of directors of the Georgia corporation; that monthly or semimonthly reports were made by said Rutledge to the Georgia corporation of all business transacted by said Texas corporation; that the affairs of said Texas corporation were conducted solely and with full authority by the said Georgia corporation through its directors; that the Texas corporation never had any meetings of its pretended directors and failed to keep up the outward semblance and form of corporate existence, looking solely to the Georgia corporation for its guidance and remitting all its collections, save the running expenses, to said Georgia corporation; that it was under the complete control and direction of said Georgia corporation.

Now, in answer to said allegations, in paragraph 8 of defendants' answer, defendants say:

"These defendants deny that said Texas corporation failed to keep up its corporate existence, but affirm that at all times said Texas corporation was in good standing, with a duly elected board of directors and officers and at all times complied with the requirements of the laws of the state of Texas."

It must be then held to be admitted that in fact the Texas corporation was but the creature or agent of the Georgia corporation and controlled by the latter corporation, and that all of its stock had been purchased with money furnished by the Georgia corporation, that the salary of said Rutledge was in fact paid by the Georgia corporation, and all the money used by the Texas corporation was furnished by the Georgia corporation; and we consequently find that the allegations therein contained with reference to the relation of the two corporations were in fact true, except as specifically denied.

In paragraph 11 of plaintiffs' petition, they, in substance, allege that some time prior to February 8, 1913, the said Seltzer, president of the Georgia corporation, for the purpose of enriching himself at the expense of said Georgia corporation, promoted and organized in Georgia a corporation known as the American Bakers' Corporation of Atlanta, Ga.; that he made himself the president of said Bakers' Corporation at a large salary and caused said Bakers' Corporation to issue a large block of bonds, about $200,-000 worth, secured by property worth a great deal less than said amount; that said Seltzer caused and procured said Georgia corporation to buy said bonds, or to advance money thereon, which practically took all of the money out of said Georgia corporation; that during said time said Seltzer was president of the Georgia corporation and Texas corporation and the Bakers' Corporation; and that said Rutledge and Miller were directors in both the Texas corporation and the Georgia corporation. In reply thereto:

The defendants "deny in toto the allegations as made and alleged and the manner alleged in said paragraph and, in this connection, these defendants would show that, while they are informed and believe upon creditable authority that the said Georgia corporation had some dealing and relations with the American Bakers' Corporation of Atlanta, Ga., these defendants, nor either of them, were in any sense a party thereto and interested therein or participated therein, and are advised that the true facts concerning said dealings and relations between said Georgia corporation and the American Bakers' Corporation is an immaterial issue in this case so far as the same affects these defendants."

In this purported denial, there is no pretense of negation of the allegation that Seltzer had made himself president of the Texas corporation and the Bakers' Corporation, in addition to being president of the Georgia corporation, and that he had caused to be issued by the Bakers' Corporation $200,000 worth of bonds secured by property worth much less, and that he had caused the Georgia corporation to purchase or advance money upon the same, and therefore we must take these facts as admitted, and since, as previously noted, the defendants who were in court, to wit, E. D. Rutledge and the Texas corporation, had practically admitted that the Texas corporation was in fact and in purpose the agent of the Georgia corporation, we are led to believe that these were allegations of material facts which were binding even upon the two defendants who filed their answer in the trial court.

In paragraph 12, plaintiffs alleged, in substance, that, through the fraud and mismanagement of said Selzter and his associates, the said Georgia corporation became in a very bad financial condition, and on or about August, 1912, that Rutledge was advised by telegrams and letters from said Seltzer, as president of the Georgia corporation, and as the act of the Georgia corporation, to stop making any further loans until further notified. It is therein further alleged, on information and belief and as a matter of fact, that said Rutledge became acquainted with and fully knew the condition of said Georgia corporation in August or September, 1912, and that Seltzer and associates knew of said condition, and that, if Rutledge did not know of such conditions, he had information thereof to put him upon inquiry, and that he stood in a fiduciary capacity to the plaintiffs, and it was his duty to acquaint them with said conditions and to fully discover said condition for himself. In answer thereto, in paragraph 11 of defendants' answer, they state:

"These defendants deny that there was any fraud or mismanagement on the part of Seltzer and his associates in respect to said Georgia corporation, and these defendants further deny that the said Rutledge had any knowledge of the actual condition of affairs of the said Georgia corporation at any time prior to the 8th of February, 1913; and in this connection these defendants would say, in the latter part of the year 1912, the said defendant Rutledge had been advised that said Georgia association was in bad condition and needed assistance, but as to the exact status of such condition he was uninformed, and these defendants further deny that plaintiffs had no knowledge of the condition of said association prior to the 8th day of February, 1913. But that they and each of them had been advised some time prior to said date that said association was in a precarious condition and needed financial assistance."

In this denial, except as to the "fraud or mismanagement" on the part of Seltzer and his associates, the material allegations in said paragraph of plaintiffs' petition are practically admitted; that is, to the effect that the Georgia corporation was reduced to a very bad financial condition in August, 1912, and that said Rutledge was advised by Seltzer, as president of the Georgia corporation, of said fact, and further notified to stop making loans, and that defendant Rutledge was aware of the condition of said Georgia corporation in August or September, 1912, and that said Seltzer and associates knew of said condition.

In view of the voluminous pleadings of the appellants and appellees herein, we do not deem it necessary nor practicable in the scope of this opinion to go more into detail as to such pleadings or to quote more fully from them; but, from a careful examination thereof, we are forced to the conclusion that the material allegations of plaintiffs' petition

are not so specifically and definitely denied in defendants' answer as to authorize the vacating of the order of the trial court in granting a temporary injunction, upon the verified pleadings alone, and we believe that the court erred in his action therein.

The cause is reversed and remanded, and it is ordered by this court that the order of the trial court dissolving the injunction be set aside, and said injunction continue in full force until otherwise lawfully altered.